## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| **LONG BEACH SECURITIES CORP.,** |
| Plaintiff, |
| v. |
| **NATIONAL CREDIT UNION ADMINISTRATION BOARD, as Liquidating Agent of Southwest Corporate Federal Credit Union and Members United Corporate Federal Credit Union,** |
| Defendant. |

Case No. 1:17-cv-01333 (TNM)

## MEMORANDUM OPINION

This case represents one piece of the litigation resulting from the 2008 financial crisis. The Plaintiff, Long Beach Securities Corporation, previously settled a suit with the National Credit Union Administration Board over certain residential mortgage-backed securities. Long Beach now argues that the settlement agreement requires the Board to relieve Long Beach of its liability for a third-party indemnity claim based on those same securities, or, alternatively, that unjust enrichment principles require the same result. I conclude that one of Long Beach's two contract arguments, and the unjust enrichment count, survive the Board's Motion to Dismiss.

## I. BACKGROUND

The National Credit Union Administration is an independent federal agency that charters and regulates federal credit unions "under the management of a National Credit Union Administration Board." 12 U.S.C. § 1752a; Compl. 1. Beginning in 2008, some credit unions under the Board's authority were decimated by failed investments in residential mortgage-backed securities, and the Board stepped in to act first as the credit unions' conservator, and ultimately as their liquidating agent. Def.'s Mot. Dismiss 2-3. In this liquidating agent capacity,

the Board filed civil cases against various entities that had been involved in selling the securities to the credit unions—suits that led to this case.

## A. The Board Settles with JPMorgan and Long Beach

In 2011-2013, the Board filed four suits against entities owned directly or indirectly by JPMorgan Chase & Co. (JPMorgan), "relating to the purchase of residential mortgage-backed securities" by credit unions then in liquidation. Compl. ¶ 1. Long Beach Securities Corporation (Long Beach) was included in that suit as "a subsidiary of non-party JPMorgan Chase Bank, NA., which, in turn, is a wholly owned bank subsidiary of JPMorgan." *Id.* ¶¶ 1, 8. JPMorgan entered into a global settlement of all four cases, paying the Board over $1.4 billion under a Settlement Agreement signed in November 2013. *Id.* ¶ 1, Ex. A, ECF No. 1-1 (Settlement Agreement). The agreement included two paragraphs dealing with the Board's suits against third parties—sections 8(a) and 8(b)—that Long Beach now attempts to enforce in this action. Settlement Agreement 7-8.

## B. The Board Accepts an Offer of Judgment Against Credit Suisse

When the Board settled with JPMorgan, it was also in active litigation against Credit Suisse Securities (USA) LLC and Credit Suisse First Boston Mortgage Securities Corp. Compl. ¶ 3. That suit alleged, among other things, that Credit Suisse USA had made "misstatements concerning the standards applied in originating the mortgage loans" associated with two securities transactions covered by the JPMorgan Settlement Agreement. *Id.* ¶ 28. The Credit Suisse defendants made an offer of judgment "that involved paying the [] Board the full amount of damages it was claiming . . . while otherwise limiting the judgment to one that would have no precedential or *res judicata* effect and treating it as though it were a settlement of disputed matters." *Id.* ¶ 29. The Board had 14 days to accept the offer or it would lapse, and the Board

would have to pay the defendants' "costs incurred after the offer was made" unless they later obtained a more favorable judgment. Fed. R. Civ. P. 68. The Board accepted the offer one day before the deadline, and the court in April 2016 entered a Stipulated Judgment for over $50 million, including amounts for pre-judgment interest and attorney's fees that the parties had negotiated. Compl. ¶¶ 30-31. "During the negotiations it had with [the Credit Suisse defendants], the [] Board . . . made no effort to obtain . . . a release" "from contribution or indemnity for [Long Beach] or any other JPMorgan entity." *Id.* ¶ 33. The Board also did not reduce the Stipulated Judgment "to account for [Credit Suisse USA's] alleged indemnification rights against [Long Beach]." *Id.* ¶ 33.

### C. Long Beach Settles an Indemnity Claim With Credit Suisse

In two securities transactions with federal credit unions that caused the Board suits, Credit Suisse USA had acted as the underwriter, and Long Beach as the depositor. *Id.* ¶¶ 3, 23 (the Long Beach Mortgage Loan Trust 2006-1 transaction, and the Long Beach Mortgage Loan Trust 2006-6 transaction). Each transaction had an Underwriting Agreement, under which Long Beach "agreed to indemnify and hold harmless [Credit Suisse] USA against various matters arising out of the [pertinent] Transaction, including liability for alleged misstatements as to matters other than information relating to the underwriters." *Id.* ¶¶ 24, 26. After the Stipulated Judgment with the Board, Credit Suisse USA "demanded indemnity" from Long Beach in the amount of $19.62 million, invoking these Underwriting Agreements. *Id.* ¶ 34.

Long Beach, in turn, demanded that the Board "reduce the Stipulated Judgment it obtained against [Credit Suisse USA] and/or otherwise take steps to protect [Long Beach] from [the] indemnification claim. The [] Board steadfastly refused to do so." *Id.* ¶ 35. When told by the Board that it should file an administrative proof of claim, Long Beach did so. *Id.* ¶ 36.

Meanwhile, Credit Suisse USA "continued to threaten litigation against [Long Beach] in order to seek recovery on its claim for indemnification." *Id.* Long Beach and Credit Suisse USA agreed to enter "non-binding mediation and, in the event the mediation was unsuccessful, arbitration." *Id.* ¶ 37. Their agreement to this effect was "drafted . . . to allow the [] Board to participate in the mediation discussions and/or arbitration should it choose to do so," and Long Beach informed the Board of this option in December 2016, ahead of the mediation scheduled for January 10, 2017. *Id.* The Board did not respond until February 2017—after the mediation session had occurred—stating that "it would not participate in any future mediation or arbitration proceedings." *Id.* ¶ 38.

Although the initial mediation session in January 2017 was unsuccessful, Long Beach and Credit Suisse USA "continued to participate in follow-up discussions with the mediator," eventually agreeing to settle the "$19.62 million claim for $10 million." *Id.* ¶ 39. In April 2017, the two parties entered into an agreement that fully released Credit Suisse USA's claims against Long Beach, and Long Beach paid Credit Suisse USA the $10 million in settlement funds. *Id.* In June 2017, the Board denied Long Beach's administrative claim. *Id.* ¶ 40.

### D. Long Beach Sues the Board

In July 2017, Long Beach filed this case against the Board. In Count I of the Complaint, Long Beach argues that the Board has breached the Settlement Agreement by (1) "failing to use its 'good faith and best efforts' to obtain for [Long Beach] a release from [Credit Suisse] USA of claims on the basis of contribution[] [or] indemnification," and by (2) "refusing to reduce the Stipulated Judgment it obtained in the Credit Suisse Action in an amount sufficient to hold [Long Beach] harmless against [Credit Suisse] USA's claim for indemnification." *Id.* ¶¶ 44-45. In Count II, Long Beach claims that by benefiting from the $1.4 billion JPMorgan settlement,

without reducing that amount or the $50 million Credit Suisse Stipulated Judgment to offset the

Credit Suisse USA indemnification claim against Long Beach, the "Board has been unjustly

enriched in an amount to be determined at trial." *Id.* at 15.

## II. LEGAL STANDARDS

"[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed

factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). That said, "a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S.

at 570). "A claim crosses from conceivable to plausible when it contains factual allegations that,

if proved, would 'allow the court to draw the reasonable inference that the defendant is liable for

the misconduct alleged.'" *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir.

2015) (alteration omitted) (quoting *Iqbal*, 556 U.S. at 678). In this inquiry, a court must "draw

all reasonable inferences from those allegations in the plaintiff's favor," but it does not "assume

the truth of legal conclusions." *Id.*

New York law governs the interpretation of this contract, as the parties agree. Settlement

Agreement 10 ("This Agreement is governed by and shall be construed in accordance with the

laws of the State of New York."). "Under New York law . . . the question of whether a written

contract is ambiguous is a question of law for the court." *JA Apparel Corp. v. Abboud*, 568 F.3d

390, 396 (2d Cir. 2009). "Ambiguity is determined by looking within the four corners of the

document, not to outside sources." *Id.* (citation omitted). Ambiguity does not exist "merely

because the parties urge different interpretations," but rather when the language at issue is

"capable of more than one meaning when viewed objectively by a reasonably intelligent person

who has examined the context of the entire integrated agreement and who is cognizant of the

customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Id.* at 396-97 (quoting *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000)). "[W]here the contract language creates ambiguity, extrinsic evidence as to the parties' intent may properly be considered," but "[i]f the contract is unambiguous, its meaning is . . . a question of law for the court to decide." *Id.* at 397. "Contract language is not ambiguous if it has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Id.* at 396 (internal quotation marks and citations omitted).

"In interpreting an unambiguous contract, the court is to consider its '[p]articular words' not in isolation 'but in the light of the obligation as a whole and the intention of the parties as manifested thereby.'" *Id.* (citation omitted); *Kolbe v. Tibbetts*, 3 N.E.3d 1151, 1156 (N.Y. 2013) (same). "[U]nder New York law, words and phrases . . . should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 133 (2d Cir. 2016) (internal quotation marks and citation omitted).

## III. ANALYSIS

Long Beach contends that the Board has either breached the Settlement Agreement, or else been unjustly enriched by its failure to protect Long Beach from the Credit Suisse indemnification claim. The Board has moved to dismiss. I conclude that Section 8(a) of the Settlement Agreement does not apply, but that the other claims survive.

## A. Where It Relies on Section 8(a), the Complaint Fails to State a Claim

The first contractual provision at issue reads:

> 8. <u>Judgment Reduction and Release of Claims</u>
>
> (a) In the event any Liquidating Agent obtains a judgment against any other party or parties relating to the Securities identified in Exhibit A or Exhibit B (a "Third Party Judgment"), and such other party or parties, in turn, successfully assert(s) a claim against any of the Released Defendant Persons relating to the Securities on the basis of contribution, indemnity or any other similar legal theory or claim (a "Claim Over"), the Liquidating Agents agree they will reduce the judgment or award they obtain or have obtained against the party asserting the Claim Over in a percentage calculated using the pro tanto rule, the proportionate rule or the pro rata rule, or such other rules as may apply in the relevant jurisdiction, whichever percentage is sufficient to cover fully or otherwise hold the Released Defendant Persons harmless in all respects from the other party's or parties' Claim Over against the Released Defendant Persons. The Liquidating Agents agree, with respect to a proceeding in which one or more of the Liquidating Agents is a party, that they shall consent to and join in, and with respect to all other proceedings consent to, any motion by the Released Defendant Persons seeking a determination that this Agreement constitutes a release or settlement in good faith of any Claim Over in any such litigation.

Settlement Agreement 7-8.

For the motion to dismiss, the Board assumes that the Stipulated Judgment it obtained against Credit Suisse USA constitutes a qualifying third-party judgment. Def.'s Mem. In Support of Def.'s Mot. Dismiss at 22 (Mot. Dismiss). Instead of challenging this point, the Board argues that Credit Suisse USA did not "successfully assert[] a claim" against Long Beach, because Long Beach voluntarily settled the claim, and no court ever decided to accept it. Mot. Dismiss 22-27. Long Beach counters by pointing to the plain language of the contract, and contending that Credit Suisse USA settling an indemnification demand satisfies the dictionary definitions of the words "successfully" and "assert." Opp. 18-19. After examining the full

contract between the parties, I conclude that the plain language of Section 8(a) does not apply to the voluntary settlement here.

"[S]uccessfully assert" is not a term of art, at least as used in this contract. The Settlement Agreement does not explicitly define the term, and New York courts often use the word "assert" to describe the attempted enforcement of an indemnification claim by email or letter. *See, e.g. Uncas Int'l LLC v. Crimzon Rose, Inc.*, 2017 WL 2839668 at *8 (S.D.N.Y. June 26, 2017) (noting that in "the July Letter . . . [the Plaintiff] asserted its demand for indemnification"); Opp. 18 n. 8 (collecting cases). So the Board's reliance on the law of judicial estoppel—along with a court's coincidental use of the phrase "successfully asserted"—is irrelevant. *See* Mot. Dismiss 23-24 (citing, among others, *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 599 (6th Cir. 1982) ("The requirement that the position be successfully asserted means that the party must have been successful in getting the first court to accept the position.")). The "underlying rationale" for judicial estoppel "is that a party should not be allowed to convince . . . one judicial body to adopt factual contentions, only to tell another judicial body that those contentions were false. It follows that judicial estoppel should not be applied if no judicial body has been led astray." *Konstantinidis v. Chen*, 626 F.2d 933, 938–39 (D.C. Cir. 1980) (citations omitted). Because "success in [a] prior proceeding is . . . an essential element of judicial estoppel," *id.*, the entire doctrine *presumes* that the party being estopped has prevailed in court at least once before (not the definition of "successfully assert"), and it has no application to the prior question of whether "successfully assert" is limited to the litigation context.

It is not judicial estoppel case law, but the words of the agreement itself that point to the litigation context. Section 8(a) only applies if the Board "obtains a judgment" against a third party, who "in turn, successfully assert(s) a claim against any of the Released Defendant."

Settlement Agreement § 8(a). In contemplation of related "proceedings," the Board also promises—in Section 8(a)'s only other sentence—to "join in" or at least "consent to" "any motion by the Released Defendant Persons seeking a determination that this Agreement constitutes a release or settlement . . . of any Claim Over in any such *litigation*." *Id.* (emphasis added). The entire paragraph assumes a litigation context. It would be incongruous to say that Credit Suisse USA has "successfully assert[ed] a claim" against Long Beach, under this section, just because the parties voluntarily settled a claim after non-binding mediation.

The conclusion that "successfully assert" contemplates litigation draws more support from Section 8(a)'s specific definition of "Claim Over." Not every legal theory will suffice. Instead, the "successfully assert[ed] claim" must "relat[e] to the Securities" at issue and arise "on the basis of contribution, indemnity or any other similar legal theory or claim." Settlement Agreement § 8(a). Both contribution and indemnity are legal theories that, in this context, would ordinarily require filing with a court for enforcement. Contribution, as defined below, is the sort of claim that would be difficult to define and enforce in practice without a tribunal:

> The right that gives one of several persons who are liable on a common debt the ability to recover proportionally from each of the others when that one person discharges the debt for the benefit of all; [or] the right to demand that another who is jointly responsible for a third party's injury supply part of what is required to compensate the third party.

*Contribution*, Black's Law Dictionary (10th edition 2014). And indemnification—the claim raised by Credit Suisse USA—is even more instructive. "Generally, federal courts disallow claims for indemnification because such claims run counter to the policies underlying the federal securities acts." *Eichenholtz v. Brennan*, 52 F.3d 478, 484 (3d Cir. 1995); *see also Heizer Corp. v. Ross*, 601 F.2d 330, 334 (7th Cir. 1979) ("A securities wrongdoer should not be permitted to escape loss by shifting his entire responsibility to another party. If indemnification were

9

allowed, those found liable for the breach of a statutory obligation might escape liability."). This Settlement Agreement was crafted with federal securities law in mind,[1] suggesting that the parties drafted the phrase "*successfully* assert" in anticipation of actual litigation to determine if an indemnity claim was valid, before triggering a judgment reduction. If a winning indemnity claim is unlikely, it makes sense to require that the asserting party prevail before a tribunal before promising anything. The context makes clear that "successful" means "successful before a tribunal."

Both parties point out that the Board alleged violations of state securities laws (from Texas and Illinois) rather than federal violations, in their pertinent claims against Credit Suisse USA. Mot. Dismiss 26; Ex. 11 at 103-105 (Amended Complaint against the Credit Suisse defendants); Opp. 20-21. But this fact does not undermine the inference, since the viability of indemnification claims in the state context is an open question. Both Texas and Illinois based their own securities statutes, or "blue sky" laws, on the federal code. *Reed v. Prudential Sec. Inc.*, 875 F. Supp. 1285, 1292 (S.D. Tex. 1995), *aff'd*, 87 F.3d 1311 (5th Cir. 1996) ("[A]rticle 581–33, the civil liability section of the Texas Securities Act, was modeled after § 12(2) of the Federal Securities Act."); *Nat'l Credit Union Admin. Bd. v. RBS Sec. Inc.*, 112 F. Supp. 3d 61, 64–65 (S.D.N.Y. 2015) ("The Illinois Supreme Court . . . has noted that Section 12 of the Illinois Blue Sky Law 'is closely analogous to' Section 17 of the Securities Act . . .. Section 17(a)(2) is itself materially identical to Section 12(a)(2) of the Securities Act.") (citations omitted).

Because of this, Texas and Illinois courts interpreting these laws explicitly look to jurisprudence interpreting federal securities law for guidance. *In re Westcap Enters.*, 230 F.3d

---

[1] Settlement Agreement 3-4 ("Released Plaintiff Claims" and "Released Defendant Claims" specifically include "claims arising under the federal securities laws").

717, 726 (5th Cir. 2000) ("[B]ecause the Texas Securities Act is so similar to the federal

Securities Exchange Act, Texas courts look to the decisions of the federal courts to aid in the

interpretation of the Texas Act."); *Sterling Tr. Co. v. Adderley*, 168 S.W.3d 835, 840 (Tex. 2005)

(holding that the Texas Security Act is to be "construed . . . to effectuate its general purpose to

maximize coordination with federal and other states' law and administration.") (quoting Tex.

Rev. Civ. Stat. Ann. art. 581–10–1A); *Nat'l Credit Union Admin. Bd. v. RBS Sec. Inc.*, 112 F.

Supp. 3d 61, 64 (S.D.N.Y. 2015) ("The Illinois Supreme Court . . . has noted that Section 12 of

the Illinois Blue Sky Law [defining a violation of the statute] 'is closely analogous to' Section 17

of the Securities Act, 15 U.S.C. § 77q, and has looked to federal judicial interpretations of

Section 17 in construing Section 12.") (quoting *People v. Whitlow*, 433 N.E.2d 629, 633 (Ill.

1982). If federal policy prohibits indemnification claims, a strong chance exists that

substantially similar state statutes will have the same application. Long Beach cites no case

suggesting that Texas or Illinois courts would reach (or have reached) a different result. With a

significant chance that state securities policy also prohibits the enforcement of indemnification

claims, the same inference holds: "*successfully* assert" suggests that the contract requires success

(however unlikely) in the courts, or at least before a binding tribunal.

In response, Long Beach contends that the policy against indemnification claims for

violations of the federal securities laws applies only when "the indemnitee had been found at

least negligent under the federal securities laws." Opp. 20-21 (citing cases). On this basis, Long

Beach argues that Credit Suisse USA's indemnity claim would have succeeded in court, even if

that were required, since it never admitted to any scienter in the Stipulated Judgment with the

Board. *Id.* But the legal premise of this argument fails. In *Perry v. Duoyuan Printing, Inc.*, a

court dismissed a cross-claim for indemnification where the indemnitee had not admitted to any

fault in the underlying settlement, reasoning that "settlement may well have occurred where . . . the facts clearly showed that the settlor had violated the securities regulations," 232 F. Supp. 3d 589, 595 (S.D.N.Y. 2017) (quoting *Donaldson Lufkin & Jenrette Sec. Corp. v. Star Techs., Inc.,* 561 N.Y.S.2d 371, 373 (Sup. Ct. 1990), *aff'd*, 580 N.Y.S.2d 657 (Sup. Ct. App. Div. 1992)), and that "the policy of encouraging the settlement of litigation . . . must bow to . . . federal securities law principles." *Id.* (citation omitted).[2]

Long Beach tries to isolate the words "successfully" and "assert" from their contractual context, arguing that the indemnification demand here satisfied the relevant dictionary definitions. Opp. 18-19 ("'Assert' means 'to state positively' or 'to invoke or enforce a legal right.' . . . [The indemnification] claim was . . . asserted 'successfully,'" because Credit Suisse USA achieved "a 'favorable or desired outcome.'") (citations omitted). To be sure, "words and phrases . . . should be given their plain meaning." *Process Am., Inc.*, 839 F.3d at 133. But "the contract should [also] be construed so as to give full meaning and effect to *all* of its provisions." *Id.* (emphasis added). By ignoring the litigation-focused context for "successfully assert" and the limitation of a "Claim Over" to "contribution, indemnity or any other similar legal theory or claim," Settlement Agreement § 8(a), Long Beach is ignoring the admonition that "when reviewing a contract, [p]articular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties manifested thereby." *Kolbe*, 3 N.E.3d at 1156 (internal quotation marks and citation omitted). The parties specifically chose to use the term "successfully assert" in *this* contractual context, in contemplation of litigation, and about specific legal theories that would ordinarily be tested by a tribunal.

---

[2] *Perry* relied on a New York state court applying federal securities law to an indemnity contract governed by New York law, *Donaldson*, 561 N.Y.S.2d at 372, which also supports the Board's understanding of the Settlement Agreement (another contract governed by New York law).

Long Beach also reasons that if the Board and JPMorgan "had wanted Section 8(a) to apply only where a third party had obtained a final, litigated indemnity judgment, they would have said so." *Id.* at 19. But it is not the Board's position, nor my understanding of the contract, that "successfully assert" requires a final judgment. Context tells me that Section 8(a)'s requirement that a Claim Over be "successfully" asserted requires some measure of *success* in a tribunal. But litigation in a court is not necessarily required, and neither is final judgment. In defining the claims that each side will release *vis-à-vis* the other, the Settlement Agreement refers to legal claims "no matter how asserted . . . that were, could have been, or may be asserted . . . in any federal or state court, or in any other court, tribunal, arbitration, proceeding, administrative agency or other forum in the United States or elsewhere." Settlement Agreement 3-4 at §1(h)-(i). This long list of fora never specifically mentions "mediation" or "settlement negotiations."

Although I need not decide every possible application of the phrase today, I conclude that "successfully assert" unambiguously requires more than a voluntary, mediated settlement, "when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *See JA Apparel Corp.*, 568 F.3d at 396-97 (citation omitted). On this material issue, I see "no reasonable basis for a difference of opinion." *Id.* at 396 (internal quotation marks and citations omitted). Because the Settlement Agreement is not ambiguous on this point, Long Beach's attempted application of Section 8(a) to what they acknowledge was a voluntary, mediated settlement fails to state a claim upon which relief can be granted.

**B. Where it Relies on Section 8(b), the Complaint Successfully States a Claim**

Long Beach also alleges that "[t]he [] Board has breached [Section 8(b) of] the Settlement Agreement by failing to use its 'good faith and best efforts' to obtain for [Long Beach] a release from [Credit Suisse] USA of claims on the basis of contribution, indemnification or any similar legal theories relating to amounts paid to the [] Board pursuant to the Stipulated Judgment." Compl. ¶ 44. For its part, the Board does not claim to have made any effort to obtain a qualifying release for Long Beach (or any release at all), but argues that the Stipulated Judgment does not constitute a "Third Party Settlement," and that in any event a "best efforts" provision is unenforceable under New York law, particularly in the context of a Rule 68 offer of judgment. Mot. Dismiss 15-22. But both defenses fail, at least at the motion to dismiss stage, and I conclude that Long Beach has stated a plausible claim to relief.

Section 8(b) reads:

> (b) The Liquidating Agents further agree that, to the extent any of them settle, on or after the date of this Agreement, any claims they may have against any other party relating to the Securities and on which the Liquidating Agents provide a release to such other parties (a "Third Party Settlement"), the Liquidating Agents will use their good faith and best efforts to include in the Third Party Settlement a release from such other party in favor of the Released Defendant Persons (in a form equivalent to the releases contained herein) of any claims relating to the Securities on the basis of contribution, indemnity or any similar legal theory or claim under which the Released Defendant Persons would be liable to pay any part of such Third Party Settlement, provided however that in no event shall the Liquidating Agents be required to decline a settlement they otherwise deem acceptable because such third party refuses to release the Released Defendant Persons.

Settlement Agreement § 8(b).

The initial question is whether the Board secured a "Third Party Settlement" in its case against Credit Suisse USA, by agreeing to a Stipulated Judgment. Section 8(b) says that a

qualifying settlement has occurred if "[t]he Liquidating Agents . . . settle . . . any claims they may have against any other party relating to the Securities and on which the Liquidating Agents provide a release to such other parties." *Id.* The Board argues that "a Rule 68 offer is not a settlement offer, and a judgment entered under Rule 68 is not a settlement," given the unique constraints posed by Rule 68 itself. Mot. Dismiss 17. But this argument cannot survive even a cursory glance into the cases that the Board itself cites. As the Board explains, "Rule 68 gives defendants a unique tool for resolving cases where there is a 'strong probability' that, after a trial on the merits, 'the plaintiff will obtain a judgment but the amount of the recovery is uncertain.'" Mot. Dismiss 16 (quoting *Delta Air Lines, Inc. v. August*, 450 U.S. 346, 352 (1981)). But what the Board calls "a unique tool for resolving cases," Mot. Dismiss 16, the Supreme Court calls "an . . . inducement to settle."

> The purpose of Rule 68 is to encourage the settlement of litigation. In all litigation, the adverse consequences of potential defeat provide both parties with an incentive to settle in advance of trial. Rule 68 provides an additional inducement to settle in those cases in which there is a strong probability that the plaintiff will obtain a judgment but the amount of recovery is uncertain. Because prevailing plaintiffs presumptively will obtain costs under Rule 54(d), Rule 68 imposes a special burden on the plaintiff to whom a formal settlement offer is made. If a plaintiff rejects a Rule 68 settlement offer, he will lose some of the benefits of victory if his recovery is less than the offer.

*Delta Air Lines, Inc.*, 450 U.S. at 352. This passage rebuts the Board's arguments: a Rule 68 offer is "a formal settlement offer," and the Rule's penalties are intended to "induce[] [the offeree] to settle." *Id.*

The same rebuttal could be applied to each of the cases on which the Board relies. The Board cites *McKelvey v. Sec'y of U.S. Army*, 768 F.3d 491, 497 (6th Cir. 2014), for the proposition that "offers of judgment" and "settlement offers" are "not the same." Mot. Dismiss at

17. That is true enough, in that offers of judgment differ from pure settlement offers. But *McKelvey* itself affirms that Rule 68 judgments are a specialized form of settlement. 768 F.3d at 496 ("Rule 68 . . . uses a combination of carrots and sticks to encourage settlement and deter wasteful litigation.") The Board also cites *Mallory v. Eyrich*, but the passage it selects merely drives home the point. Mot. Dismiss 17 (quoting 922 F.2d 1273, 1277 (6th Cir. 1991) ("Rule 68 has several unique features that distinguish it from *other* means of compromise and settlement in civil litigation."))(emphasis mine). The very grammar of the sentence—"other means of . . . settlement"—informs the reader that Rule 68 is a unique subset of settlements generally.

The text of Rule 68 itself also supports the same conclusion. A settlement agreement constitutes a binding contract, and the Rule speaks in the language of contracts: an "offer," followed by "acceptance" "within 14 days after being served," or else the "unaccepted offer is considered withdrawn." Fed. R. Civ. P. 68 (a)-(b). Although under Rule 68 an accepted offer results in the entry of "judgment" on the previously "specified terms," rather than in the creation of a mere contract, *id.*, enforceability is a hallmark not only of court judgments, but of contract law as well, including settlement agreements. In fact, a Rule 68 judgment *is* a contract, with mutually agreed-upon terms, albeit a contract reduced to an instantly enforceable court order. "The plain purpose of Rule 68 is to encourage settlement and avoid litigation." *Marek v. Chesny*, 473 U.S. 1, 5 (1985). The editors of the Rule themselves explained that subsequently added provisions intended this purpose. *See* Advisory Committee Note on Rules of Civil Procedure, Report of Proposed Amendments, 5 F.R.D. 339, 482-83 (1946) (new language "should serve to encourage settlements and avoid protracted litigation"). At least for the motion to dismiss stage, I conclude that the Stipulated Judgment against Credit Suisse USA constitutes a "Settlement" under Section 8(b).

But the Board also argues that even if the Stipulated Judgment constitutes a "Third Party Settlement," the "best efforts" provision is unenforceable under New York law, particularly in the context of a Rule 68 offer of judgment. Mot. Dismiss 18-22. The Board is right that "a Rule 68 'offer, once made, is non-negotiable.'" Mot. Dismiss 17 (quoting *Nusom v. Comh Woodburn, Inc.*, 122 F.3d 830, 834 (9th Cir. 1997)); *see also Bentley v. Bolger*, 110 F.R.D. 108, 113 (C.D. Ill. 1986) ("An Offer of Judgment is in the nature of an offer to contract for settlement, and the requirement that an acceptance mirror an offer is fundamental to the Law of Contract."). This argument receives additional support from Section 8(b)'s final provision, which says that "in no event shall the [Board] be required to decline a settlement they otherwise deem acceptable because such third party refuses to release the Released Defendant Persons." Settlement Agreement § 8(b). In other words, I take the Board's argument that the Credit Suisse USA offer of judgment created unique constraints on its bargaining power, and that Section 8(b) means what it says about not forcing the Board "to decline a settlement . . . because [a] third party refuses to [include a] release." *Id*. Yet that does not settle the matter, particularly since the Board apparently never asked.

Without the benefit of discovery, I cannot conclude that the Board's obligation to exert "good faith and best efforts to include in the Third Party Settlement a [qualifying] release" conferred no obligations at all in the context of the Credit Suisse litigation. Perhaps the Board was in active settlement negotiations leading up to the offer of judgment, and could have asked for a release during those discussions. Perhaps the Board could have placed a phone call to Credit Suisse USA, with the offer of judgment on the table, and asked for a new offer of judgment containing a release. After all, Rule 68 says that "[a]n unaccepted offer is considered withdrawn, but it does not preclude a later offer." Fed. R. Civ. P. 68(b). Although *acceptance*

must mirror the offer, *Bentley*, 110 F.R.D. at 113, nowhere does the Rule prohibit requests for a new or different offer.[3]

And though a "best efforts" clause can be enforced under New York law only in specific circumstances, it is at least plausible that this Settlement Agreement provides enough specificity for the task. *Ashokan Water Servs., Inc. v. New Start, LLC* provides a good overview of the applicable case law:

> There is authority in the Second Department that "[w]here ... a clause in an agreement provides that a party must use its best efforts, it is essential that the agreement also contain clear guidelines against which to measure such efforts in order for such efforts to be enforced." . . . [C]ourts will refuse to enforce an express "best efforts" provision, or to imply one where it is not expressed, in those situations in which it amounts to a dreaded "agreement to agree." But numerous courts, including the New York Court of Appeals and the Second Department, have applied an express "best efforts" provision without articulated objective criteria, or implied one where it was not expressed. On a doctrinal level, at least, the cases can be reconciled by recognizing that there is no *a priori* rule precluding enforcement of a "best efforts" obligation even in the absence of articulated criteria, and that the obligation will be enforced where sufficient content may otherwise be read into it against which the promisor's performance may be measured.

807 N.Y.S.2d 550, 553 (Civ. Ct. 2006) (numerous citations omitted).

Here, several elements of Section 8(b) provide articulated criteria against which the Board's conduct could be measured. The Board agreed to "use their good faith and best efforts to include in the Third Party Settlement a release from such other party in favor of the [Long Beach] (in a form equivalent to the releases contained herein) of any claims relating to the

---

[3] For this reason, the Board's repeated contention that it was "not required to reject" the Offer of Judgment are irrelevant. *See, e.g.* Mot. Dismiss 18. The question is whether the Board exerted "best efforts" in obtaining a release, not whether they needed to reject the Credit Suisse USA offer.

Securities." Settlement Agreement § 8(b). The specific claims at issue are "claims . . . on the basis of contribution, indemnity or any similar legal theory or claim under which the Released Defendant Persons would be liable to pay any part of such Third Party Settlement." *Id.* Of particular interest is the requirement that the release should be "in a form equivalent to the releases contained herein," referring to the universal language of the releases in the Settlement Agreement itself. *See* Settlement Agreement §§ 1(h) ("Released Plaintiff Claims"), 1(i) ("Released Defendant Claims"), 5 ("Release by the Plaintiff Releasing Persons"), and 7 ("Release by the Releasing Defendant Persons"). This provision gave the Board concrete language for a release request. In other words, the Board knew fairly precisely what it needed to request. The question is whether it tried, and that is a factual question not resolvable at this stage.

In the context of a motion to dismiss, where I must "draw all reasonable inferences from [the Complaint's] allegations in the plaintiff's favor," *Banneker Ventures, LLC,* 798 F.3d at 1129, I cannot conclude that Long Beach could prove no set of facts entitling it to relief here. At least as to Section 8(b), the Complaint satisfies minimum pleading standards.

### C. The Unjust Enrichment Alternative Count States a Claim

Long Beach's unjust enrichment claim also meets those minimum standards. "Unjust enrichment occurs when: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *In re APA Assessment Fee Litig.,* 766 F.3d 39, 45–46 (D.C. Cir. 2014).[4] "Unjust

---

[4] As Long Beach points out, and the Board does not dispute, I need not determine which jurisdiction's law applies to the unjust enrichment claim, since "the laws of the possible jurisdictions . . . do not differ meaningfully." Opp. 21 n. 11 (collecting cases from Washington, D.C., New York, Delaware, and Ohio).

enrichment is an equitable quasi-contract claim 'based on a contract implied in law.'" *Id.* (citation omitted). The claim is a "'[l]egal fiction' designed 'to permit recovery by contractual remedy in cases where, in fact, there is no contract, but where circumstances are such that justice warrants a recovery as though there had been a promise.'" *Id.* Long Beach alleges that (1) it conferred a benefit on the Board in the $1.4 billion JPMorgan settlement, that (2) the Board retained that amount (and in fact essentially doubled its recovery related to the Long Beach transactions by the $50 million Credit Suisse Stipulated Judgment), refusing to make any effort to offset the Credit Suisse USA indemnification claim against Long Beach, and that (3) the retention of the benefit is unjust, since the "essence of the bargain" between the parties was that "the [] Board would not be entitled to recover from third parties amounts that the third parties could turn around and recover from [Long Beach] and the other Released Defendant Persons." Compl. at 15.

The Board does not assert that these facts cannot show unjust enrichment. Instead, the Board contends that as a matter of both District of Columbia and New York law, "a plaintiff may only bring a claim for unjust enrichment where the parties have no express agreement that covers the subject matter at issue." Mot. Dismiss 28-29, n. 20 (citing cases). Because Long Beach has asserted that the Settlement Agreement *does* cover the conduct at issue, the Board argues that the unjust enrichment claim must fail. *Id.* at 28-29. But there is no rule against pleading in the alternative. In fact, the caselaw reveals that unjust enrichment claims often properly arise in the liminal space just outside a contract's enforceable scope. *See In re APA Assessment Fee Litig.*, 766 F.3d at 46 ("plaintiffs' decision to pay the special assessment had no bearing on plaintiffs' rights or obligations as [American Psychological Association] members under the bylaws and rules . . . [and] was instead an extra-contractual payment falling outside the 'scope' of the

governing contracts . . . [which] then pose no obstacle to an unjust enrichment claim seeking to recover assessment fees paid.") (citations omitted); *Union Bank, N.A. v. CBS Corp.*, 2009 WL 1675087 at *8 (S.D.N.Y. June 10, 2009) ("the predicate for dismissing quasi-contract claims is that the contract at issue 'clearly covers the dispute between the parties.' . . . [I]t is not appropriate for this Court to rule—at the inception of this case and as a matter of law—that the parties' agreements govern the instant dispute.").

In fact, to dismiss the unjust enrichment count on the ground urged, I would need to rule that the Settlement Agreement can indeed be enforced by Long Beach, on these facts, against the Board. *Union Bank, N.A.*, 2009 WL 1675087 at *8. Such a ruling is not warranted on the current record, and is certainly not something that the Board would want. And if the Settlement Agreement is indeed inapplicable as the Board claims, Long Beach will be able to press its claim that the Board retaining the benefit conferred is still somehow "unjust." Having considered the submissions from both parties, I conclude that the Complaint's unjust enrichment claim "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (citation omitted).

## IV. CONCLUSION

Accordingly, the Board's Motion to Dismiss will be granted in part, and denied in part. The Complaint's Section 8(b) and unjust enrichment claims survive, but the Section 8(a) claim fails as a matter of law. A separate order will issue.

Dated: May 7, 2018

TREVOR N. MCFADDEN
United States District Judge